**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ERWIN MAITEN,

        Plaintiff,

v.                                     Case No.  3:18-cv-978-J-34JRK

CLARA WHITE MISSION, INC.,

        Defendant.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendant Clara White Mission, Inc.'s (CWM) Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 23, Motion to Dismiss), filed November 1, 2018, and CWM's Motion for Summary Judgment (Doc. 26, Motion for Summary Judgment), filed July 31, 2019 (collectively, Motions).[1]  In the Motions, CWM seeks dismissal of, or alternatively, summary judgment on the claims in <u>pro se</u> Plaintiff Erwin Maiten's Second Amended Complaint and Demand for Jury Trial (Doc. 21, SA Complaint), filed October 18, 2018.  Since Maiten is appearing <u>pro se</u>, the Court advised him of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)), and gave him an opportunity to respond to the CWM's Motion.  <u>See</u> Summary Judgment Notice (Doc. 27) (setting forth the provisions of Rule 56), filed August 2, 2019.  Maiten has filed responses to the Motion to Dismiss, <u>see</u> Doc. 24 (Response to Motion to Dismiss), and

---

[1] In support of its Motion for Summary Judgment, CWM attached a variety of documents.  <u>See</u> Doc. 25-1 (Maiten Deposition); Doc. 25-2 (Maiten Deposition Attach.); Doc. 25-3 (Pittman Declaration); Doc. 25-4 (Wright Declaration).  In citing to the Maiten Deposition, the Court will use the page numbers assigned by the Court's CM/ECF docketing system.

the Motion for Summary Judgment, <u>see</u> Doc. 28 (Response to Motion for Summary Judgment).[2]  Therefore, the Motions are ripe for review.  For the reasons set forth below, the Court finds that CWM is entitled to summary judgment, and therefore, the Court will deny the Motion to Dismiss as moot.  <u>See</u> <u>Abdullah v. City of Jacksonville</u>, 242 Fed. Appx. 661, 662 (11th Cir. 2007) (affirming the denial of a "defendants' motion to dismiss as moot when [the district court] granted their motion for summary judgment.").

## I.    SUMMARY JUDGMENT STANDARD

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[3]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913,

---

[2] In support of his Response to CWM's Motion for Summary Judgment, Maiten attached a variety of documents.  <u>See</u> Doc. 28-1 (Medical Records); Doc. 28-2 (Employment Records).  Likewise, Maiten attached several documents to his SA Complaint.  <u>See</u> Doc. 21-1 (Dismissal Letter); Doc. 21-2 (Withheld Salary Documentation); Doc. 21-3 (EEOC Documentation); Doc. 21-4 (VA Documentation); Doc. 21-5 (October 2015 Performance Review); Doc. 21-6 (February 2017 Performance Review); Doc. 21-7 (Employee Manual); Doc. 21-8 (Property Appraisal); Doc. 21-9 (Maiten Resume).

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u>  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  <u>Campbell v. Shinseki</u>, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party

opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Of course, "pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." <u>Tannenbaum v. United States</u>, 148 F.3d 1262, 1263 (11th Cir. 1998). However, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." <u>Brown v. Crawford</u>, 906 F.2d 667, 670 (11th Cir. 1990). Although courts show leniency to <u>pro se</u> litigants, courts "will not serve as de facto counsel or 'rewrite an otherwise deficient pleading in order to sustain an action.'" <u>Nalls v. Coleman Low Fed. Inst.</u>, 307 Fed. Appx. 296, 298 (11th Cir. 2009) (quoting <u>GJR Invs., Inc. v. Cnty. of Escambia</u>, 132 F.3d 1359, 1369 (11th Cir. 1998)).

## II.    BACKGROUND

Maiten began working for CWM in 2003. Employment Records at 26. In late July 2017, CWM terminated him from his position. Dismissal Letter at 2. Maiten was fifty-seven years old at the time. EEOC Documentation at 3. In this action, Maiten alleges that CWM discriminated against him on the basis of a disability and his age, and also that it retaliated against him in violation of Title VII of the Civil Rights Act of 1964.

CWM "has served the Jacksonville[, Florida,] community since 1904 . . . as a service center for the homeless and disadvantaged persons . . . . [CWM serves] approximately 400-500 men, women, and children in need, daily." Employee Manual at 6. As explained by Ju'Coby A. Pittman, President and CEO of CWM, "[g]rant funds are

very important to the financial stability of CWM. Passing inspections by agencies such as the Department of Veterans Affairs [(VA)] is very important to maintaining access to grant funds." Pittman Declaration at ¶¶ 1, 19-20.

When Maiten was first employed at CWM in 2003, he served as a part-time front desk security assistant. Employment Records at 26; Maiten Deposition at 5, 7. Prior to joining CWM, Maiten worked as a mail carrier for the United States Postal Service (USPS), see Employment Records at 43,[4] and served as a member of the United States Navy, see generally VA Documentation. In his deposition, Maiten stated he left the Navy because of injuries to his knees. Maiten Deposition at 3, 13. His VA Documentation reflects Maiten had service related disabilities, but does not specify the nature of those disabilities. VA Documentation at 2.

After starting at CWM as a part-time front desk assistant, Maiten was promoted several times "including to a full-time Residence Advisor, Case Manager and Director of Residents and Drop-in Center ('Director')." Pittman Declaration at ¶ 4. See also Maiten Deposition at 7-8; Maiten Deposition Attach. at 5. Maiten's various titles during his tenure with CWM also included Director of Residents and Drop-In & Fleet Services, as well as Manager of Residential/Admissions. Maiten Deposition Attach. at 27; Pittman Declaration at ¶ 17.

While working at CWM, Maiten had periodic performance reviews. Maiten Deposition at 9. His October 2015 Performance Review was generally positive, but did include some constructive feedback regarding areas in which he could improve. For

---

[4] Maiten varies in how he describes his departure from USPS. He suggests that he stopped working because he had knee problems and could no longer deliver mail. Maiten Deposition at 4, 28. However, he also acknowledges that he was fired from his USPS job for assaulting another mail carrier. Id.

example, the evaluator commented that Maiten often forgot meetings or tasks. <u>See</u> October 2015 Performance Review at 3, 4, 7. As a means to address this issue, Maiten's supervisor at the time, Kevin Carrico**,** recommended that Maiten use a planner or the calendar on his iPad to "keep things in [his] memory." <u>Id.</u> at 3, 7. Maiten viewed Carrico's recommendation that he use an iPad to help him "keep on track" as a "suggestion." Maiten Deposition at 13, 14. Although CWM did not provide Maiten with an iPad, he did use his own device. Maiten also noted that at one point in time another CWM employee, Myrtle Wright, was assigned to help Maiten "be on track." <u>Id.</u> at 13, 14.[5] Maiten's supervisor also commented that "sometimes [Maiten's] frustration with [CWM clients] comes out as negative interaction. The administration has received complaints that Mr. Maiten talks down to the residents at times." October 2015 Performance Review at 4. Accordingly, Carrico recommended that Maiten "be conscious of how you come across to residents. It's not what you say but how you say it." <u>Id.</u> at 7.

In January of 2016, Carrico, the then Vice President of Operations, left CWM, and his position remained unfilled for many months. Pittman Declaration at ¶ 13-14; Wright Declaration at ¶¶ 9-10. In August of 2016, after the position had been vacant for at least six months, Sharon Wright decided to apply because she believed the lengthy "vacancy had negatively impacted the operations of CWM." Wright Declaration at ¶ 10. That same month, Pittman appointed Wright as the new VP of Operations. Pittman Declaration at ¶ 13; Wright Declaration at ¶ 11. At the time of her appointment, the record suggests Wright

---

[5] It is not entirely clear when Maiten received assistance from Myrtle Wright or why. In the October 2015 Performance Review, the evaluator included a notation that "over the last year Maiten was given an assistant . . . which he often times had no clue what she was doing and wasn't using this person enough to accomplish his administrative duties." October 2015 Performance Review at 5.

was fifty-two or fifty-three years old.  Wright Declaration at ¶ 1 (indicating Wright was fifty-five years old in July of 2019).  Wright had "served on the CWM Board of Directors from 2009 to 2013 and became knowledgeable about the day-to-day operations of CWM."  Id. at ¶ 8.  Prior to being promoted to Vice President of Operations, Wright had also worked for CWM since 2013 as its instructor for the Janitorial/Custodial program.  Pittman Declaration at ¶ 16; Wright Declaration at ¶ 9.

Maiten neither applied for nor expressed an interest in the Vice President of Operations position.  Maiten Deposition at 22; Pittman Declaration at ¶ 14.  Although he complains that CWM never advertised the position, Maiten Deposition at 22, Maiten does not deny that he was aware that the position was vacant from January 2016 until it was filled in August 2016.  Pittman Declaration at ¶ 14.  When CWM appointed Wright, rather than Maiten, to be Vice President of Operations, Maiten perceived that he had been "passed over."  Maiten Deposition at 22.  He believed he had more seniority than Wright, and that she was younger than he.  EEOC Documentation at 3.  However, Maiten did not complain about the decision at the time.  Maiten Deposition at 22.

In September of 2016, and in an effort to be more efficient, "CWM reorganized its organizational hierarchy . . . ."  Pittman Declaration at ¶ 17.  Wright's title was changed to "Vice President of Facilities and Operations [and] incorporate[ed] additional responsibilities related to facility management."  Wright Declaration at ¶ 18.  At the same time, Maiten's title was changed from "Director of Residents and Drop-In Center" to the "Manager of Residential/Admissions."  Pittman Declaration at ¶ 17.  Under this reorganization, Maiten's duties and responsibilities largely remained the same and his compensation did not change.  Id.; Wright Declaration at ¶ 19.

In February of 2017, Maiten received another performance review for his work from September 2016 to February 2017. February 2017 Performance Review at 2.[6] In contrast to the generally positive feedback Maiten received in his October 2015 Performance Review, the February 2017 review was less positive and identified numerous areas in which he needed to improve. For example, the review included negative comments in ten of the seventeen different evaluation categories. Id. at 3-4, 5. Some of the comments were general in nature, referencing Maiten's inconsistency in completing his work in a timely and attentive manner. See id. at 3 ("Employee knows the technical parts of his job, but fails to accomplish job duties in a timely manner . . . "); id. ("employee is not perceived as consistent in job responsibilities, and not consistent in responding."); id. ("Employee is aware of policies and procedures of CWM, but has not followed to ensure continuingly [sic] and enforcement updates."); id. at 4 ("The employee shows a deficit" in "the ability to identify problems, potential problems, develop[ing] solutions, and evaluat[ing] decision effectiveness."). Others identified specific examples of instances where Maiten's work performance was poor or mediocre, including instances of negative interpersonal interactions with CWM staff and clients. See id. at 3 (detailing specific instances of failing to have an established plan or activities for veterans); id. (specific examples of Maiten's failure to fully implement CWM policies and procedures); id. at 4 (negative interactions with staff and clients); id. at 5 (same).

---

[6] The February 2017 Performance Review states that Wright was Maiten's supervisor and the document appears to be signed by both Wright and Maiten. February 2017 Performance Review at 2, 7. However, in his deposition, Maiten suggested that Wright completed a different evaluation for him in which she indicated her general satisfaction with his work. Maiten Deposition at 10. He further suggested that the February 2017 Performance Review before the Court which was far more critical was actually completed by Pittman. Regardless of who completed the evaluation, the only review for the September 2016 to February 2017 period in the record is the February 2017 Performance Review, which appears to be signed by Wright, and not by Pittman. And Maiten does not dispute that this review was presented to him in February 2017. Id. at 23. Indeed, he acknowledges that he signed it. Id.

The February 2017 evaluation also referenced Maiten's performance at a recent VA inspection. Under the heading of "Employee need[s] to be aware of policies to ensure correct decisions/reasoning from day to day polices & procedures," was the comment that "[e]mployee mentioned the storage of medication and food in the same refrigerator during an inspection." Id. at 5. As explained in more depth by Maiten in his deposition, it was his responsibility to make sure that veterans' medications were stored appropriately. Maiten Deposition at 11. During a November 2016 VA inspection,

> one of the inspectors asked what was in the refrigerator. And she also asked for the keys. We had it locked. So I told her the clients medication and the clients special diet food that they had in there. Then she got the key and she looked in it. Then we went upstairs for debrief. She stated that I told her what was in the refrigerator

Id. As a result of the inspection, CWM received two to three negative notes from the VA, including that they needed to "get[] another refrigerator . . . [and] separat[e] the medication from the food." Id. As reported by Maiten, Pittman was upset with him for telling the VA inspector what was stored in the refrigerator. Id. "She even wrote it in my eval . . . that I said something inappropriate to the inspector . . . . Her word[] is that I voluntarily gave information I shouldn't have. That's the part that's in the evaluation." Id. Following the November 2017 inspection, Maiten felt that he and Pittman were "disconnected, so to speak." Id. Maiten nonetheless clarified that Pittman "never treated him bad" but that their "connection got farther apart" after the VA inspection. Id. at 12. For her part, Pittman stated that Maiten did not raise any concerns with her regarding "the Department of Veterans Affairs inspection in November 2016." Pittman Declaration at ¶ 21.

As a result of his February 2017 Performance Review, CWM placed Maiten on a 90-day Performance Improvement Plan (PIP). See February 2017 Performance Review

at 6-7; Maiten Deposition at 26.  In the PIP, Wright directed Maiten to

> [s]et goals for projects and tasks.  Improve communication with all viable technology.  When given instructions from or by CWM CEO they need to be completed in a timely manner and if uncertain of the task, then ask questions.  Develop a strategic plan for the next 90 days and communicate said plan to Mrs. Sharon Wright by _____ 2017.

Id. at 6.  However, as discussed below, there were ongoing communication issues between Maiten and his supervisors regarding how, and in what manner, he was supposed to proceed with his PIP.

In early June of 2017, it appears Wright communicated and met with Maiten regarding his PIP.  Maiten Deposition at 26; Maiten Deposition Attach. at 57.  In Wright's communication with Maiten, she noted that since placing Maiten on the PIP in February, he had either failed to complete a variety of his PIP assignments, or was late in doing so.  Maiten Deposition Attach. at 57.  Additionally, in an e-mail dated June 5, 2017, Wright informed Pittman that Wright had communicated with Maiten about his performance plan, but that Maiten expressed his belief that the incomplete plan he submitted earlier in the year was sufficient, and that he otherwise believed his PIP was unwarranted.  Id. at 55.

On June 7, 2017, the CWM staff participated in a mock inspection in order to prepare for an upcoming visit from the VA in association with grants CWM received from the federal agency.  Maiten Deposition at 26.  The inspection was not a surprise.  Indeed, several days before the mock inspection, Pittman e-mailed Maiten telling him that she would be doing it on June 7th.  Id.  Following the mock inspection, Pittman sent an e-mail to Maiten stating she "was very disappointed of what [she] observed during the inspection," stating her belief that CWM would have failed the inspection if it had been performed by the VA.  Maiten Deposition Attach. at 58.  Pittman detailed over sixteen

specific deficiencies and areas requiring improvement prior to the upcoming VA inspection, and she noted that "it appears that the follow-through hasn't taken place . . . or completed on a regular [basis]." Id. Pittman further stated the inspection was "unacceptable and dangerous to our staff, volunteer and residents. Immediate[] action is required . . . ." Id. Finally, Pittman complained that Maiten "stepped away, several times, during the inspection . . . . You disengaged yourself, I had to get your attention and engage you back in the process and that is unacceptable." Id. at 59. In response, Maiten contacted his team members to acknowledge that his department let CWM "down in a big way," and that their day-to-day operations did not meet the required standards. He called upon his team to "stand up and take control of our Department. [I]f we need more time we will work this weekend but I am sure we can make it happen . . . ." Id. at 60.

Additionally, in the latter part July of 2017, there was a conflict between Maiten and Pittman about his ability to access and remove certain files from her office. Pittman sent a message to the CWM team noting that several boxes of VA files had been removed from her office without permission or any communication indicating that the files were going to be removed. Id. at 61. Maiten acknowledged that he had removed the files, and apologized. Id. He later explained in his deposition that it was his common practice to take files out of Pittman's office whenever he needed them to fulfill his job duties. Maiten Deposition at 27. He stated that

> I apologized that I may have offended her, but that's the practice . . . . – I had been in her office many times and got files out of the office if I needed them. If for some reason I needed them that day, I went and got them out of the office so we can complete the files that we had. But that was normal practice, especially if her assistant was there and gave us an authorization.

Id.

Later that month, on July 28, 2017, Maiten's supervisors informed him he was being terminated from his employment at CWM. Maiten's termination letter stated that he was being dismissed because of his inconsistency in "communication and follow through on job responsibility and performance." Dismissal Letter at 2. According to Pittman and Wright, Maiten "was not fulfilling the essential functions of his position when he was terminated. [His] termination was the result of poor performance and communication. [He] failed to compete the duties, essential functions, and responsibilities of his position." Pittman Declaration at ¶¶ 22-24; Wright Declaration at ¶¶ 21-22. Both Pittman and Wright also noted that Maiten "was counselled about his performance issues on numerous occasions from November 2016 until his termination in July 2017." Pittman Declaration at ¶ 18; Wright Declaration at ¶ 20. Nonetheless, his work performance did not improve. Wright Declaration at ¶ 20. CWM eventually replaced Maiten with a sixty-two year old male. Pittman Declaration at ¶ 25.

Maiten believes that CWM terminated him for discriminatory and retaliatory reasons. In his deposition, Maiten testified that he suffered from memory problems, and that CWM terminated him, in part, because of his memory issues. Maiten Deposition at 13. While Maiten is not entirely specific as to the root or cause of his memory issues, he testified that when he was a child he was in a car accident which temporarily left him in a coma. Id. Additionally, in his early 20s, Maiten had an accident in which he ran "headfirst into a telephone pole" while playing softball, which he suggests resulted in facial fractures. Id. His medical records from the softball accident noted a laceration on his left eyebrow and eyelid and a contusion under his eye, along with leg and arm injuries. Medical Records at 1-2, 5. The medical records noted that Maiten's neurological exam was

"unremarkable." Id. at 2. Maiten also testified that he suffered from a variety of other medical problems, including artificial knees, PTSD, depression and anxiety, a fused disk in his back, and a pin in his right hand which limited function. Maiten Deposition at 13.

Notably, in 2013, CWM worked with Maiten regarding his anxiety, which often arose when Maiten was in crowded and noisy rooms. Maiten Deposition at 14; EEOC Documentation at 3. In an effort to help Maiten, management at CWM excused him from attending staff meetings while Maiten worked with his doctor to alter his medications and temper his anxiety. Maiten Deposition at 14. Once Maiten and his health care providers were able to identify a more appropriate prescription for him, he resumed attending staff meetings. Id. at 14-15.

In his SA Complaint, Maiten suggests that CWM dismissed him because of his memory issues. SA Complaint at ¶¶ 24-25. Maiten noted that one of his supervisor's "complaints was I was forgetting stuff or not completing my tasks . . . and not following up." Maiten Deposition at 13. However, none of Maiten's supervisors had knowledge that he had a disability related to his memory and Maiten never requested accommodations in regard to his memory issues. Pittman Declaration at ¶¶ 5-8; Wright Declaration at ¶¶ 12-17.

Following his termination, Maiten contacted the U.S. Equal Employment Opportunity Commission (EEOC) and filed a Charge of Discrimination form. EEOC Documentation at 3-5. There he alleged he was disabled and had received accommodations to enable him to perform the essential duties of his job. Id. at 3. He noted that he was "passed over for a promotion to Vice President of Operations . . . and the position was given to a much younger Female with less seniority, qualifications, and/or

experience." Id. He further alleged he complained to Pittman about "the injustice done against" him, and she subsequently used his disability against him in his work evaluation, and placed him under a PIP. Id. Maiten stated that when he was ultimately terminated, CWM failed to follow "policy, the proper disciplinary process and/or allowing [him] the ninety (90) days specified in the PIP for evaluating [his] performance." Id. Finally, in his EEOC Charge of Discrimination, Maiten asserted he was "discriminated and retaliated against because of [his] age . . . . , [his] sex . . . . [and] because of [his] disability . . . , and for having participated in an activity protected by Title VII." Id. On May 9, 2018, the EEOC sent Maiten a "right to sue" letter indicating that if he wanted to bring an action against CWM, he needed to do so "within 90 days" of his receipt of the notice. Id. at 2.

As a result of the foregoing, Maiten filed the instant action against CWM asserting claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2 et seq., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 et seq., and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. See generally SA Complaint. In Count I of his Second Amended Complaint, Maiten alleges CWM terminated him in retaliation for his responses during the November 2016 VA inspection, and therefore violated Title VII. See SA Complaint at ¶¶ 11-20. In Count II, Maiten asserts that CWM wrongfully terminated him based on his memory issues in violation of the ADA. Id. at ¶¶ 21-32. Finally, in Count III, Maiten alleges that he "was passed over for promotion . . . in favor of a young female with less seniority and experience" in violation of the ADEA. Id. at ¶ 33, 34-39.[7]

---

[7] Maiten does not raise a claim of sex discrimination in his SA Complaint.

### III.     ARGUMENTS OF THE PARTIES[8]

In its Motion for Summary Judgment, CWM reiterates many of the arguments it raised in the Motion to Dismiss. It argues that based on the uncontested facts before the Court, there is insufficient evidence to support Maiten's claim that CWM retaliated against him for engaging in protected activity when it fired him from his position. CWM contends that no reasonable jury could find that Maiten engaged in statutorily protected activity, that he was terminated because of that activity, or that there was a sufficient causal connection between his alleged protected activity and CWM's alleged retaliatory actions. Motion for Summary Judgment at 9-13. With regard to Maiten's disability claim, CWM argues that there is insufficient evidence to show that Maiten was disabled, that he was a qualified individual under the ADA, that he requested an accommodation, and that CWM unlawfully terminated him because he was disabled. Id. at 13-20. Finally, in addressing Maiten's age discrimination claim, CWM contends that a reasonable jury could not find that a "substantially younger" individual was hired instead of Maiten, that he was otherwise qualified for the position for which he was "passed over," or that he had presented evidence that CWM did not give him the new position because of age discrimination. Id. at 20-25.

---

[8] In its Motion to Dismiss, CWM argues that all of Maiten's allegations are conclusory and fail to state claims for which relief can be granted. Motion to Dismiss at 2-3, 4-5, 6-12. CWM also contends that Maiten initiated his action more than ninety days after he received his EEOC right to sue letter, and therefore his claim is untimely. Id. at 5-6. In response, Maiten broadly argues that his action is timely, and that he has sufficiently alleged claims of retaliation, disability discrimination, and age discrimination. See generally Response to Motion to Dismiss. With regard to the timeliness issue, Maiten alleges in the SA Complaint that he received his right to sue letter on May 14, 2018, and filed suit on August 10, 2018, well within the required 90 days. Thus, it appears his suit was timely filed. Notably, CWM does not renew the untimeliness argument in its Motion for Summary Judgment.

In response to CWM's Motion for Summary Judgment, Maiten raises a variety of factual arguments. He contends he was not provided any valid reasons for his termination; that he did request accommodations from CWM; that he did not engage in poor work at CWM; that he was treated differently than others in the course of his termination; and that CWM never posted or formally sought out applicants for the Vice President of Operations position. See generally Response to Motion for Summary Judgement. Accordingly, Maiten contends that the Court should deny both of CWM's Motions.

## IV. DISCUSSION

### A. Retaliation (Count I)

In Count I, Maiten alleges CWM retaliated against him in violation of his rights under Title VII. SA Complaint at ¶¶ 11-20. Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice . . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The Eleventh Circuit describes the first portion of this rule as the "opposition clause," and the second portion as the "participation clause." See E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000). To establish a prima facie case of retaliation under Title VII, a plaintiff must show: "(1) [he] participated in an activity protected by Title VII; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) (citing Gupta v. Fla. Bd. of Regents, 212 F.3d 571,

587 (11th Cir. 2000)[9]).   In the context of a Title VII retaliation claim, the adverse action element requires a "materially adverse action," which means an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted)).  Additionally, the Supreme Court has clarified that to sustain a retaliation claim a Title VII plaintiff must demonstrate "but-for" causation between the participation in the protected activity and the adverse action.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Id.

Based on the record before the Court, and drawing all reasonable inferences in Maiten's favor, Haves, 52 F.3d at 921, summary judgment is due to be entered in favor of CWM on Maiten's Title VII retaliation claim.  This is so because Maiten fails to point to any evidence even remotely suggesting that he engaged in any activity protected under Title VII.  "Title VII protects 'individuals who explicitly or implicitly communicate[ ] a belief that [an employment] . . . practice constitutes unlawful employment discrimination.'" Howard v. Sunniland Corp., 281 F. Supp. 3d 1253, 1259 (M.D. Fla. 2017) (quoting Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1311 (11th Cir. 2016) (alteration in original)).  See also Miller-Goodwin v. City of Panama City Beach, Fla., No. 5:08-CV-228/RS/EMT, 2009 WL 10697303, at *6 (N.D. Fla. Apr. 20, 2009) ("An employee engages in a statutorily protected expression if she opposed a practice forbidden under Title VII, such as gender discrimination, or has made a charge, testified, assisted, or participated

---

[9] In Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008), the Eleventh Circuit recognized that Gupta was overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

in a Title VII investigation, proceeding, or hearing." (citing <u>Duncan v. Madison County</u>, 272 Fed. Appx. 859, 863 (11th Cir. 2008)).  As such, an individual "engages in statutorily protected activity when he complains about an action that he reasonably believed was unlawful under Title VII.  <u>Banks v. iGov Tech., Inc.</u>, 661 Fed. Appx. 638, 645 (11th Cir. 2016) (citing <u>Little v. United Tech., Carrier Transicold Div.</u>, 103 F.3d 956, 960 (11th Cir. 1997)).

Here, even Maiten himself does not suggest that CWM retaliated against him for engaging in any activity protected under Title VII.  Instead, in his SA Complaint Maiten alleges that CWM terminated him in retaliation for his "response to inspectors during a Veterans Administration Inspection in November, 2016."  SA Complaint at ¶ 14.  Likewise, in his deposition, Maiten stated that he received a negative comment in his February 2017 Performance Review indicating that his supervisors were unhappy that he shared information with the VA inspectors regarding the storage of veterans' food and medications in a single refrigerator.  Maiten Deposition at 11.  Indeed, Maiten complained that Pittman "even wrote it in my eval . . . that I said something inappropriate to the inspector . . . .  Her word[] is that I voluntarily gave information I shouldn't have.  That's the part that's in the evaluation."  <u>Id.</u>[10]

Regardless of whether CWM terminated or otherwise retaliated against Maiten for his statement to the VA inspectors about the storage of veterans' medicine and food, his

---

[10] The Court notes that the evaluation information to which Maiten refers does not explicitly state that Maiten "voluntarily gave information" he should not have, or that he was reprimanded for providing truthful information to the VA inspectors.  Maiten Deposition at 11; Response to Motion to Dismiss at 2.  Rather, in the February 2017 Performance Review, one of the categories under which Maiten was evaluated inquired into whether he was "aware of policies to ensure correct decisions/reasoning from day to day policies & procedures."  February 2017 Performance Review at 5.  As an example of his shortcomings in this area, the evaluator noted that Maiten "mentioned the storage of medication and food in the same refrigerator . . . ."  <u>Id.</u>

retaliation claim fails because his statement to the VA inspectors was not related to any unlawful employment activity under Title VII. See 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). As such, the Court concludes the record does not allow for a reasonable inference that Maiten engaged in a statutorily protected activity. See e.g., Bell v. City of Auburn, Alabama, 722 Fed. Appx. 898, 901 (11th Cir. 2018) ("At no point in his deposition or in his sworn declaration did [plaintiff] say that the City denied him overtime on account of his race; rather, [plaintiff] said he had complained that overtime was only being given to individuals with certain kinds of commercial drivers' licenses. On this record, the district court properly found that [plaintiff] did not engage in statutorily protected activity."). Accordingly, Maiten is unable to make out a prima facie case of retaliation under Title VII, and summary judgment is due to be entered in favor of CWM on Maiten's retaliation claim (Count I). See Evans v. Books-A-Million, 762 F.3d 1288, 1297-98 (11th Cir. 2014) (affirming dismissal on summary judgment of Title VII retaliation claim where plaintiff "failed to demonstrate that she engaged in any 'protected activity' prior to her termination"); see also Clampett v. Agency for Health Care Admin., 669 Fed. Appx. 963 (11th Cir. 2016) (affirming summary judgment on Title VII retaliation claim where plaintiff failed to show he engaged in statutorily protected activity); Banks, 661 Fed. Appx. at 645 (same); Laincy v. Chatham County Board of Assessors, 520 Fed. Appx. 780, 783 (same).

## B. Disability Discrimination (Count II)

In Count II of his SA Complaint, Maiten alleges that CWM wrongfully terminated him in violation of the ADA. SA Complaint at ¶¶ 21-32. "The ADA prohibits discrimination 'against a qualified individual on the basis of disability.'" Frazier-White v. Gee, 818 F.3d 1249, 1255 (11th Cir. 2016) (quoting 42 U.S.C. § 12112(a)). A plaintiff may establish an ADA claim through circumstantial evidence using the familiar McDonnell Douglas burden-shifting analysis employed in Title VII employment discrimination cases. See Holly v. Clairson Industries, LLC, 492 F.3d 1247, 1255 (11th Cir. 2007).[11] Under the McDonnell Douglas burden-shifting analysis, a plaintiff must first make out a prima facie case of disability discrimination, which creates a presumption of discrimination in favor of the plaintiff. See Cleveland v. Home Shopping Network Inc., 369 F.3d 1189, 1193 (11th Cir. 2004). To establish a prima facie case of discrimination under the ADA, a plaintiff must "show (1) a disability, (2) that [he] was otherwise qualified to perform the job, and (3) that [he] was discriminated against based upon the disability." Id. (citing Williams v. Motorola, Inc., 303 F. 3d 1284, 1290 (11th Cir. 2002); Gordon v. E.L. Hamm & Assoc., Inc., 100 F.3d 907, 910 (11th Cir. 1996)). Once the plaintiff has established these elements, unlawful discrimination is presumed and the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]." Id. (citing Wascura, 257 F.3d at 1242). The employer's burden at this stage is only one of production, it need not "persuade the court that it was motivated by the reason." Id. If the employer carries its burden, then the presumption of discrimination disappears, and

---

[11] Maiten has not identified any direct evidence of discrimination. See Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001) (citing Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1226 (11th Cir. 1999)) (noting that in the absence of direct evidence a plaintiff may rely on the McDonnell Douglas burden-shifting analysis).

the plaintiff must satisfy the ultimate burden of showing that the employer's stated reason was a pretext for intentional discrimination.  Id.

The record before the Court does not allow for a reasonable inference that Maiten has established a prima facie case of disability discrimination.   In his SA Complaint, Maiten alleges he was terminated due to his memory issues.  SA Complaint at ¶¶ 24-25.[12]  In this regard, Maiten asserts that his

> wrongful termination . . . constitutes a violation of [the] ADA . . . which prohibits an employer from discharging an employee after agreeing to make reasonable accommodation for the disability.  Since 2014, the Defendant understood the Plaintiff had issues dealing with his memory due to military related injuries.  As a result, one of the ways to assist him with this issue was to provide reasonable accommodations in the form of an IPAD, allowing him to satisfactorily perform his assigned duties.

Id.[13]  However, Maiten has failed to establish that he is a disabled individual or that he requested and was denied a reasonable accommodation that would have allowed him to accomplish the essential functions of his position.  Therefore, his disability claim cannot proceed.

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  Here, Maiten does not contend, nor has he presented any evidence, that he

---

[12] As noted earlier in the Order, Maiten references a host of other ailments from which he allegedly suffers. Maiten Deposition at 13; Medical Records at 1-5; SA Complaint at ¶¶ 29-31.  However, nowhere in his SA Complaint does Maiten suggest that CWM terminated him because of these other ailments.  He does suggest, however, that some of his work assignments exacerbated his knee injuries, and that sometimes he felt unfairly reprimanded by his supervisors for events out of his  control, where such reprimands caused him additional stress.  SA Complaint at ¶¶ 30-31.  However, Maiten does not align these additional factual allegations with any specific elements associated with his ADA claim, or develop them further.

[13] Maiten does not provide the Court with any evidence to substantiate that his memory issues were associated with his military service.  He does suggest, however, that his poor knees were a result of his service in the Navy. Maiten Deposition at 3, 13.

was subject to an adverse employment action because anyone at CWM regarded him as being disabled, <u>see</u> 42 U.S.C. § 12102(1)(C), thus the Court limits its consideration to the question of whether Maiten had a physical or mental impairment that substantially limited a major life activity, <u>see</u> § 12102(1)(A), or had a record of such an impairment, <u>see</u> § 12102(1)(B).

In order to satisfy the definition of disability listed in § 12102(1)(A) or (B), a plaintiff must show that his or her claimed impairment substantially limits one or more major life activities. <u>See</u> <u>Hilburn</u>, 181 F.3d at 1229 (to establish a disability pursuant to § 12102(1)(B), plaintiff must show impairment substantially limits one or more major life activities). A "major life activity" may include, but is not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." <u>Id.</u> at § 12102(2)(A).[14] An impairment is considered to substantially limit a major life activity where the individual is

> unable to perform a major life activity that the average person in the general population can perform or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity. 29 C.F.R. § 1630.2(i)(1)(i), (ii).

<u>Malone v. Dep't of the Air Force</u>, No. 2:14cv670-MHT, 2016 WL 1170906, at *7 (M.D. Ala. Feb. 24, 2016), <u>report</u> <u>and</u> <u>recommendation</u> <u>adopted</u> <u>by</u> No. 2:14CV670-MHT, 2016 WL 1163306 (M.D. Ala. Mar. 24, 2016).

Although Maiten does not specifically identify any major life activity limited by his

---

[14] Major life activities also include major life functions as described in § 12102(2)(B), but Maiten does not assert any limitation of a major life function.

memory issues,[15] the Court liberally construes his pro se filings as contending that his memory issues impacted the major life activity of working.  See 42 U.S.C. § 12102(2)(A).  On this issue, the Eleventh Circuit Court of Appeals has instructed that

> "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs."  Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999); see also 29 C.F.R. § 1630.2(j)(3)(i) (requiring a showing that plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities").  A "class of jobs" is defined as:  "The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of an impairment."  29 C.F.R. § 1630.2(j)(3)(ii)(B).  A "broad range of jobs in various classes" is defined as:  "The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment."  29 C.F.R. § 1630.2(j)(3)(ii)(C).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  29 C.F.R. § 1630.2(j)(3)(i).

Boykin v. Honda Mfg. of Alabama, 288 Fed. Appx. 594, 596–97 (11th Cir. 2008).  See also generally Hudson v. Tyson Farms, Inc., 769 Fed. Appx. 911, 916–17 (11th Cir. 2019); Littleton v. Wal-Mart Stores, Inc., 231 Fed. Appx. 874, 877 (11th Cir. 2007); Greenberg v. BellSouth, Telecomm., Inc., 498 F.3d 1258, 1264 (11th Cir. 2007).  Drawing all reasonable inferences in favor of Maiten, as the Court must at summary judgment, Hayes, 52 F.3d at 921, the record does not allow for a reasonable inference that Maiten's memory issues substantially limited his ability to work in a class of jobs or broad range of jobs.  Accordingly, he has failed to raise a genuine issue of fact on the question of whether he

---

[15] The Court questions whether Maiten's vague "memory issues" could fall within the definition of a physical or mental impairment.  Nevertheless, because Maiten suggests the memory issues may be related to a childhood traumatic brain injury, the Court will assume they do.

has a disability.  Thus, summary judgment is due to be entered in favor of CWM as to his disability discrimination claim.  See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 483 F.3d 1265, 1268 (11th Cir. 2007) (If "'the non-moving party fails to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof, then the court must enter summary judgment for the moving party.'" (quoting Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998) (alteration in original, additional citations omitted)).

According to Maiten, his memory issues may be related to two instances from his youth in which he suffered from some form of traumatic brain injury:  a car accident which left him in a coma for a period of time, and a sporting incident in which he ran into a telephone pole.  See Maiten Deposition at 13; Medical Records at 1-5.  Maiten also broadly alleges that he suffered memory issues related to injuries he suffered from his service in the military.  SA Complaint at ¶¶ 24-25.  However, to the extent Maiten provided the Court with medical documentation regarding the head injury he suffered as a young man while playing softball, see Medical Records, or of his eligibility for disability benefits as a veteran, see VA Documentation at 2, he points to no evidence that he ever shared this information with CWM as a cause of his memory problems.  See Pittman Declaration at ¶¶ 5, 9-10; Wright Declaration at ¶¶ 12, 16-17.[16]  The record is equally devoid of any indication that Maiten provided CWM with information regarding the coma he suffered as a child and how that event might have impacted his memory.  Notably, both Pittman and Wright stated in their declarations that they "had no knowledge that [Maiten] believed he

---

[16] Although Maiten informed Pittman that he had suffered from a traumatic brain injury, he did so in the context of a request to be excused from staff meetings for a time while his doctor adjusted the medications for his anxiety.  Maiten Deposition at 14.  Notably, Maiten acknowledges that CWM accommodated his request until he was able to resume attendance.  Id. at 14-15.

had a disability related to his memory," <u>see</u> Pittman Declaration at ¶ 5; Wright Declaration at ¶ 12,[17] and Maiten points to no evidence to the contrary.

Moreover, throughout his adult life, Maiten has held a series of jobs. Of particular import, he has worked nearly continuously despite the injuries he suffered in his youth. He served in the Navy for fourteen years; he worked as a United States Postal Service carrier for nearly seven years; and he worked at CWM for fourteen years. <u>See</u> Dismissal Letter at 2; Employment Records at 26, 46; VA Documentation at 2. Moreover, during his employment at CWM, Maiten progressed through a variety of positions, starting as a part-time desk attendant and advancing to a residential advisor, case manager, and finally Manager of Residential/Admissions. Pittman Declaration at ¶ 17. Therefore, throughout his time at CWM, as well as in his previous employment, there is no indication that Maiten's alleged memory impairments substantially limited his ability to perform in a broad range or class of jobs. Indeed, Maiten's own testimony does not suggest that he considered his memory issues to limit his abilities to perform at CWM given that he believes he was qualified not only for his own job but also for the Vice President position into which CWM promoted Wright. As such, the record does not support even an inference that Maiten's memory issues, assuming they qualify as a physical or mental impairment, substantially limited his major life activity of working. <u>See</u> <u>e.g.</u>, <u>Hudson</u>, 769 Fed. Appx. at 916–17 (plaintiff who held a variety of jobs since being injured, and returned to work without any medical restrictions, failed to establish she was substantially limited in the major life activity of working); <u>Simpson v. Alabama Dep't of Human Res.</u>, 311 Fed.

---

[17] The Court also notes that the medical and disability information Maiten provided to the Court do not support an inference that he suffers from any impairment causing memory issues. The VA Documentation does not specify his disabilities and the medical records from his softball accident note that his neurological exam was "unremarkable." Medical Records at 2.

Appx. 264, 268 (11th Cir. 2009) (plaintiff failed to show impairment substantially impacted a major life activity, and therefore could not claim to be disabled by virtue of a "record of such impairment"); Boykin, 288 Fed. Appx. at 596–97 (plaintiff who was able to continue to work in a broad range and class of jobs despite his COPD did not establish that disability significantly impacted the major life activity of working); Butler v. Greif Bros. Serv. Corp., 231 Fed. Appx. 854, 857 (11th Cir. 2007) (where plaintiff performed a wide variety of jobs after being placed on work leave, "he was not substantially limited from a class of jobs or a broad range of jobs" and therefore not disabled under the ADA); Roberts v. Rayonier, Inc., 135 Fed. Appx. 351, 356 (11th Cir. 2005) (plaintiff who held job for nearly eighteen years, earned salary increases every year, and received "acceptable" job evaluation ratings, was not substantially limited in the major life activity of working); Palmer v. McDonald, No. 8:13-CV-01784-T-02JSS, 2019 WL 1490667, at *3 (M.D. Fla. Apr. 4, 2019) (plaintiff who held jobs that required him to learn new skills and was deemed "fully successful" by his employer in meeting productivity requirements did not establish that his ailment of short-term memory loss substantially impacted his major life activity of working); Palmer v. Albertson's, LLC, No. 4:09-CV-00137-SPMWCS, 2010 WL 785652, at *5 (N.D. Fla. Mar. 3, 2010) (diabetes did not satisfy "record of impairment" definition for disability, as diabetes did not substantially limit plaintiff's major life activities); Ross v. GTE Directories Corp., 73 F. Supp. 2d 1342, 1349 (M.D. Fla. 1999) (impairment claimed by plaintiff did not substantially impact a major life activity, and therefore did not constitute a "record of such impairment" disability). On this record, Maiten fails to point to any evidence supporting a conclusion that his memory issues constituted a disability as defined under the ADA.

Moreover, there is no evidence in the record to allow an inference that Maiten requested, but was denied, a reasonable accommodation for his memory issues. An employer's duty to provide a reasonable accommodation is not triggered unless a demand for an accommodation has been made. McCarroll v. Somerby of Mobile, LLC, 595 Fed. Appx. 897, 899 (11th Cir. 2014). See also Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) (plaintiff must specifically demand an accommodation in order to trigger employer's accommodation duties under the ADA).

Nothing in the record before the Court suggests that in light of his memory problems, Maiten requested that CWM provide him with a reasonable accommodation. Both Pittman and Wright stated that they had no knowledge that Maiten had either requested or received any form of accommodations for memory issues, or that he believed he had ever received an accommodation for memory issues. See Pittman Declaration at ¶¶ 6-8; Wright Declaration at ¶¶ 13-15. At most, the record shows that in his October 2015 Performance Review, Maiten's supervisor noted that Maiten sometimes forgot meetings or tasks. October 2015 Performance Review at 3. Therefore, Maiten's supervisor suggested that Maiten keep "a planner or [use the] calendar on [his] iPad as to keep things in" his memory. Id. See also id. at 7 ("Mr. Maiten [should] improve on . . . remembering things. I think he could use modern technology via an App on his I-Pad or maybe even a pocket scheduler to write things down instead of try[ing] to remember everything."). In his deposition, Maiten did not suggest that he asked for an accommodation. Instead, he stated that "[t]hey requested – my supervisor at the time . . . requested that I get an iPad to keep me on task." Maiten Deposition at 13. Additionally, Maiten stated that no one at CWM assigned an iPad to him. Specifically, he stated that

"I brought my own iPad. I wasn't assigned an iPad. That was a suggestion that I use an iPad to keep me on track." Id. at 14. Therefore, nothing in the record supports an inference that Maiten requested an accommodation for a physical or mental impairment involving his memory issues, or that CWM denied such an accommodation.[18]

Accordingly, Maiten has failed to establish his prima facie case of disability discrimination. The record before the Court does not permit for a reasonable inference that Maiten suffered from a disability, or that he requested and was denied a reasonable accommodation which would have permitted him to perform the essential functions of his job. Moreover, even if Maiten had established a prima facie case of disability discrimination, CWM has articulated legitimate, nondiscriminatory reasons for terminating him from his job. Cleveland, 369 F.3d at 1193. On the record before the Court, Maiten has failed to satisfy his ultimate burden of showing that CWM's stated reason for removing him from his job was a pretext for intentional discrimination. Id.

When CWM terminated Maiten from his job as Residential/Admissions Director, Maiten's dismissal letter stated he was being terminated because of his inconsistency in "communication and follow through on job responsibility and performance." Dismissal Letter at 2. Pittman and Wright both stated that Maiten "was not fulfilling the essential functions of his position when he was terminated. [His] termination was the result of poor performance and communication. [He] failed to complete the duties, essential functions, and responsibilities of his position." Pittman Declaration at ¶¶ 22-24; Wright Declaration

---

[18] The record before the Court does reflect that at one point during his employment at CWM, Maiten's supervisors temporarily excused him from attending staff meetings as the meetings triggered his anxiety. Maiten Deposition at 14-15. Once Maiten and his doctor were able to alter his medications to lessen his anxiety, Maiten resumed attending staff meetings. Id. Again, however, to the extent that CWM excused Maiten from attending staff meetings, this reduction in job duties was temporary in nature, and not related to Maiten's alleged memory issues.

at ¶¶ 21-22. Pittman and Wright also noted that Maiten "was counselled about his performance issues on numerous occasions from November 2016 until his termination in July 2017." Pittman Declaration at ¶ 18; Wright Declaration at ¶ 20. However, according to Wright, Maiten's work performance did not improve. Wright Declaration at ¶ 20.

As set forth in a job description, Maiten's position required, among other responsibilities, "[m]anag[ing] and follow-up on case management, substance abuse procedures, program participation and evaluations"; "[c]oordiat[ing] and monitor[ing] formal and informal agreements with collaborative partners and agencies to maintain satisfactory relationships with all collaborative organization[s]"; "[d]evelop[ing] and submit[ing] monthly employee reports to CEO/President and to supervisor;" "[m]onitor[ing] rule compliance for all program participants and staff"; "[c]oordiant[ing] and maintain[ing] Veterans & Residential Services facility (custodial, maintenance and equipment)"; the "[a]bility to work effectively with clients of diverse background, funders, volunteers and staff"; "[a]ttention to details while effectively delivering services to clients and community partners"; the "[a]bility and willingness to respond effectively and constructively to rapid change"; "[p]rovid[ing] excellent planning, organization, verbal and written communication skills"; and "[p]rovid[ing] effective and professional etiquette to staff, volunteers and clients." Maiten Deposition Attach. at 2-3.

Prior to his termination, Maiten received feedback in his October 2015 Performance Review that he needed to "improve on . . . remembering things" and to avoid "talking down" to CWM clients. October 2015 Performance Review at 4, 7. Likewise, in his February 2017 Performance Review, Maiten received extensive feedback regarding his inconsistency and tardiness in performing his job duties, his failure to comply with and

enforce CWM policies, his negative interactions with CWM clients and donors, and his lack of clear communication with work colleagues. See February 2017 Performance Review at 3, 4, 5. Additionally, and as discussed earlier in the Order, Pittman was very disappointed with Maiten's performance in the June 2017 mock inspection. Maiten Deposition Attach. at 58. Indeed, Maiten does not dispute that his department performed deficiently and admitted as much in an e-mail. Id. at 60. On this record, Maiten has not pointed the Court to any evidence to allow for a reasonable inference that CWM's stated reasons for terminating him, see Dismissal Letter at 2 (inconsistency in "communication and follow through on job responsibility and performance"), were false and a pretext for intentional disability discrimination.

Accordingly, just as Maiten has failed to establish a prima facia case of disability discrimination, he has likewise failed to present any evidence to the Court to allow for the reasonable inference that CWM's articulated reason for terminating him was pretext for discrimination. As such, summary judgment is due to be entered in favor of CWM on Maiten's disability discrimination claim (Count II).

### C. Age Discrimination (Count III)

In Count III of his SA Complaint, Maiten alleges an age discrimination claim stating that he "was passed over for promotion to the Vice President of Operations, which he was thoroughly qualified for, in favor of a young female with less seniority and experience." SA Complaint at ¶ 33. In an ADEA case involving the failure to hire or promote,

> the employee must show: (1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position [for which he was not hired] and (4) he was qualified to do the job . . . . Once an employee has established a prima facie case, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a

legitimate, nondiscriminatory reason for the adverse employment action. If the employer proffers a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the employer's reason is a pretext.

Liebman v. Metro. Life Ins. Co., 808 F.3d 1294, 1298 (11th Cir. 2015) (citations and quotation omitted); Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998). "Although a plaintiff's burden in proving a prima facie case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case." Turlington, 135 F.3d at 1432–33 (internal citation omitted).

Here, Maiten has failed to put forth evidence allowing for a reasonable inference that he has made out a prima facie case of age discrimination because he fails to create an issue of fact with regard to the question of whether he suffered an adverse employment action. Liebman, 808 F.3d at 1298 ("the employee must show . . . he was subject to an adverse employment action"). To establish a prima facie claim in the context of a failure to promote, the adverse employment action element ordinarily requires a plaintiff to show that he applied for the position and was rejected. See Williams v. VWR International, LLC, 685 Fed. Appx. 885, 887 (11th Cir. 2017) (citing Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005)). But, under certain circumstances a plaintiff may establish a prima facie case even if he did not apply for the position. Id.

> One exception is the "informal process" exception, where a plaintiff need not show that [he] applied for the job if [he] can show that the employer "d[id] not formally announce [the] position, but rather use[d] informal and subjective procedures to identify a candidate." Vessels, 408 F.3d at 768. However, under this exception the plaintiff must still show that the employer had some reason to consider [him] for the position. Id. We have not given a precise definition or test for what constitutes an informal hiring process, but we've rejected an argument that a hiring process was informal when the employer had formally posted vacant positions on its website or in local newspapers and required candidates to file an application, and the plaintiff knew about the position but chose not to formally apply. Smith v. J. Smith Lanier & Co., 352 F.3d 1342, 1346 (11th Cir. 2003). In Smith, we

distinguished the prior case of <u>Carmichael v. Birmingham Saw Works</u>, 738 F.2d 1126, 1133 (11th Cir. 1984), which "involved a system where there was no formal notice of jobs, and the company relied on word of mouth and informal review procedures," and thus the plaintiff "had no way of knowing about [a specific job's] availability." <u>Smith</u>, 352 F.3d at 1346.

<u>Williams</u>, 685 Fed. Appx. at 887. The second exception is the futile gesture exception which excuses a failure to apply where the employee "had a 'justifiable belief that the employer's discriminatory practices made application a futile gesture.'" <u>E.E.O.C. v. Joe's Stone Crabs, Inc.</u>, 296 F.3d 1265, 1274 (11th Cir. 2002); <u>Williams</u>, 685 Fed. Appx. at 887-88. To demonstrate a justifiable belief that applying would be a futile gesture "a plaintiff must demonstrate: (1) that [he] had a real and present interest in the job for which the employer was seeking applications; and (2) that [he] would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." <u>Williams</u>, 685 Fed. Appx. at 888 (quoting <u>Joe's Stone Crabs, Inc.</u>, 296 F.3d at 1274). In this regard, the Eleventh Circuit has recognized an inquiry into the hiring process as indicative of a real and present interest in applying, <u>see Joe's Stone Crabs, Inc.</u>, 296 F.3d at 1275, and the Supreme Court has "described the types of discriminatory practices that render an application futile as 'the most entrenched forms of discrimination.'" <u>Williams</u>, 685 Fed. Appx. at 888 (citations omitted).

Here, Maiten suggests that he should have been promoted into the Vice President of Operations position. SA Complaint at ¶ 33. While it is undisputed that Maiten never applied for or expressed interest in the post, Maiten Deposition at 22; Pittman Declaration at ¶ 14, Maiten states that "[t]here was no application" or notice for the position. Maiten Deposition at 22. However, Pittman stated in her Declaration that Maiten was aware that the position was open from January 2016 to August 2016 and did not express any interest

to her about filling the role.  Pittman Declaration at ¶ 14.  Because it is undisputed that Maiten, just like Wright, who ultimately did apply for the position, was well aware of the vacant Vice President position, it is unlikely he can avail himself of the exception discussed in Carmichael and Smith.  Smith, 352 F.3d at 1346 (noting that because the plaintiff was aware of the position but chose not to apply, his claim failed).  Nevertheless, even if CWM's failure to post the vacancy would otherwise fall within the "informal process" exception, Maiten's claim still fails because he has pointed to no evidence supporting a reasonable inference that Pittman "had some reason to consider [him] for the position."  Williams, 685 Fed. Appx. at 887 (citing Vessels, 408 F.3d at 768).   This is not a situation in which the employee had expressed even a general interest in obtaining a promotion as was the case in Carmichael.  See 738 F.2d at 1134.  Here, Pittman testified without contradiction from Maiten that Maiten never expressed an interest in the Vice President position despite it being vacant for over six months, and Maiten points to no evidence that he expressed any interest in that or any other position.  As such, the record before the Court fails to support an inference that he was subject to an adverse employment action based upon the informal process objection.

Maiten has also failed to present any other evidence to the Court to suggest that he had a "justifiable belief that [CWM's] discriminatory practices made application a futile gesture."  Joe's Stone Crabs, Inc., 296 F.3d at 1274.  Indeed, the record reflects that CWM generally hired workers over the age of fifty, Pittman Declaration at ¶ 26, and Maiten presented no evidence that CWM otherwise engaged in discriminatory hiring practices. Alvarez v. City of Miami Beach, No. 18-CV-22743-UU, 2018 WL 4693530, at *8 (S.D. Fla. Sept. 27, 2018).  See also Bonham v. Regions Mort., Inc., 129 F. Supp. 2d. 1315, 1324

(M.D. Ala. 2001) (plaintiff needed to show that employer created a discriminatory atmosphere making it futile to apply for a position). In Bonham, the court examined whether a plaintiff's failure to apply for a position undermined her claim that her employer had discriminated against her on the basis of age. The Court declined to find that it was the employer's discriminatory actions which rendered it futile for the plaintiff to apply for the position. The court reasoned that the plaintiff "provided no evidence that [her employer] encouraged persons to apply for [the desired] and other positions in an overall manner or pattern that reflect age bias." Id. In the absence of such evidence, the court concluded that the plaintiff "cannot maintain that she failed to apply for the position because of her employer's discrimination. Consequently, her failure to apply for the [desired position] render[ed] her claim of age discrimination . . . nugatory." Id. at 1324-25. The same is true for Maiten.

In the absence of such additional evidence, the Court concludes that Maiten has not established that he suffered an adverse employment action. His failure to apply for the Vice President position coupled with the lack of evidence that he expressed even a general interest in a promotion, or that his failure to apply for the Vice President position was because of CWM's discriminatory practices, causes his claim of age discrimination to fail. See e.g., Walker v. Prudential Prop. & Cas. Ins. Co., 286 F.3d 1270, 1275 (11th Cir. 2002) ("The application requirement is important . . . because it shows that the decision-maker knew about the plaintiff and the plaintiff's interest in the position.").

Maiten's claim also fails because he cannot establish that CWM placed a substantially younger individual into the Vice President of Operations position. Courts in the Eleventh Circuit have recognized that "[t]here is no bright-line rule that defines

'substantially younger' . . . ." Steele v. U.S. Dep't of Veteran Affairs, No. 8:10-cv-732-T-24EAJ, 2011 WL 2160343, at *10 (M.D. Fla. June 1, 2011); see also Suarez v. Sch. Bd. of Hillsborough Co., Fla., 638 Fed. Appx. 897, 901 n.1 (11th Cir. 2016) (recognizing divergent case law addressing what constitutes a "substantially younger" person). However, the Court of Appeals has suggested in an unpublished decision that "where plaintiffs present[] substantial evidence of discriminatory animus beyond mere age difference, . . . a smaller age difference [is] sufficient to meet the 'substantially younger' element of the ADEA prima facie case." Suarez, 638 Fed. Appx. at 901 n.1. For example, in Carter v. DecisionOne Corp. Through C.T. Corp. Sys., 122 F.3d 997 (11th Cir. 1997), the court determined that a three year difference between the plaintiff – age 42 – and the individual who replaced her – age 39 – was sufficient to meet the "substantially younger" standard where the plaintiff presented a host of other evidence to support her argument that she was terminated from her position as the result of unlawful age discrimination. Id. at 1003-04. See also Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (substantial difference existed where there was a gap of five years between the plaintiff who held his position for many years and his replacement, and where the plaintiff presented other evidence of discriminatory animus). However, the Eleventh Circuit has also noted that an age difference "without more" does not create an inference that the plaintiff's age was the "but-for" cause of an adverse employment action against him. Suarez, 638 Fed. Appx. at 901 n.1 (six year difference not sufficient).

Here, there is, at most, a four year age difference between Maiten and Wright, the individual CWM promoted into the Vice President of Operations position.[19] In this regard,

---

[19] When CWM terminated Maiten in 2017, he was fifty-seven years old. EEOC Documentation at 3. Likewise, at the time Wright submitted her Declaration as a part of this litigation in 2019, she indicated she

Maiten's case is more akin to those in which the courts determined that age differences ranging between six and thirteen years did not constitute a "substantial difference." See Suarez, 638 Fed. Appx. at 901 n.1; Steele, 2011 WL 2160343 at *10; Matthews v. City of Dothan, No. 1:04-cv-640-WKW, 2006 WL 3742237, at *12 (M.D. Pa. Dec. 18, 2006). If a gap of six or thirteen years without more does not constitute a substantial age difference, then a gap of four years appears even less substantial. The Court acknowledges that in Carter and Damon, the court concludes that age differences of three and five years could constitute a "substantial difference." Damon, 196 F.3d at 1360; Carter, 122 F.3d at 1003-04. However, as noted above, the Eleventh Circuit Court of Appeals has distinguished Carter and Damon as cases in which "plaintiffs presented substantial evidence of discriminatory animus beyond mere age difference." Suarez, 638 Fed. Appx. at 901 n.1. The same cannot be said of the record currently before the Court.

Maiten has not provided the Court with any evidence of discriminatory animus on the basis of age or evidence suggesting the reason CWM promoted Wright instead of Maiten to the Vice President of Operations position was because of age discrimination. Indeed, the record reflects that "[n]early all of CWM's employees are fifty . . . year[s] old or older," and that when Maiten was eventually terminated from his position, CWM replaced him with an individual who was sixty-two years old. Pittman Declaration at ¶¶ 25-26. Cf. Carter, 122 F.3d at 1003 (employer replaced employee with individual three years younger, and also stated it was "preferable to have a nubile young" woman making sales calls and expressed a desire to remove all the "old sleazy people" at the company). Accordingly, the record does not support an inference that CWM promoted a substantially

_____

was fifty-five years old. Wright Declaration at ¶ 1. Accordingly, Maiten was likely born in 1960 and Wright in 1964. Therefore, the difference in their ages is, at most, four years.

younger person into the Vice President of Operations position.  Therefore, Maiten cannot satisfy the third element of the <u>prima</u> <u>facie</u> case for age discrimination under the ADEA. <u>Liebman</u>, 808 F.3d at 1298 (listing elements); <u>Turlington</u>, 135 F.3d at 1432–33 (noting plaintiff must satisfy all elements for <u>prima</u> <u>facie</u> case).  Accordingly, summary judgment is due to be entered in favor of CWM on Count III in Maiten's SA Complaint.

## V. CONCLUSION

In conclusion, CWM's Motion for Summary Judgment is due to be granted and judgment entered in favor of CWM as to all claims raised in Maiten's Second Amended Complaint.  In light of the Court's determination that CWM is entitled to summary judgment in its favor, the Court denies CWM's Motion to Dismiss as moot.  <u>See</u> <u>Abdullah</u>, 242 Fed. Appx. at 662.

Therefore, in light of the foregoing, it is **ORDERED**:

1) Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 23), is **DENIED, as moot**.

2) Defendant's Motion for Summary Judgment (Doc. 26) is **GRANTED**.

3) The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Clara White Mission, Inc., and against Plaintiff, Erwin Maiten.  The Clerk of the Court is further directed to terminate all pending motions and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 26th day of September, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc26

Copies to:

Counsel of Record
Pro Se Party